U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUL 10 2020

CLERK, U.S. DISTRICT COURT
By_____
      Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

MOHAMMED KHALED AWDE,           §
                                §
              Petitioner,       §
                                §
v.                              §        No. 4:19-CV-524-A
                                §
LORIE DAVIS, Director,          §
Texas Department of Criminal    §
Justice, Correctional           §
Institutions Division,          §
                                §
              Respondent.       §

## MEMORANDUM OPINION
### and
### ORDER

This is a petition for a writ of habeas corpus pursuant to
28 U.S.C. § 2254 filed by petitioner, Mohammed Khaled Awde, a
state prisoner confined in the Correctional Institutions Division
of the Texas Department of Criminal Justice, against Lorie Davis,
director of that division, respondent. After having considered
the pleadings, state court records, and relief sought by
petitioner, the court has concluded that the petition should be
denied.

### I. FACTUAL AND PROCEDURAL HISTORY

In February 2016 a jury in Tarrant County, Texas, Case No.
1353199D, found petitioner guilty of murdering Kevin Ngugen, his
step-daughter's father, during a dispute about her curfew.
(Clerk's R. 54, 65, doc. 12-12; Mem. Op. 1, doc. 12-3.) The
appellate court affirmed the trial court's judgment and the Texas
Court of Criminal Appeals refused petitioner's petition for

discretionary review. (Electronic R., doc. 12-1.) Petitioner also filed a post-conviction state habeas-corpus application challenging his conviction, which was denied by the Texas Court of Criminal on the findings of the trial court. (SHR,[1] vol. 1, 14-30 & Action Taken, doc. 12-21.) This federal habeas petition followed.

The state appellate court summarized the facts of the case as follows:

> Appellant plainly admits that he shot Nguyen but maintains that he did so in self-defense.  Allegedly, Nguyen had lunged towards him after appellant drew a firearm and threatened to shoot. That the decedent possessed no deadly weapon at the time is undisputed. Nor did appellant testify that he believed Nguyen possessed such a weapon. Nevertheless, appellant supposedly believed Nguyen was attempting to kill him and, therefore, the jury should have been instructed that his use of deadly force was presumptively reasonable. We frame this argument within the following factual background.

> In December 2013, Nguyen was on winter break from pharmacy school and wanted to take his daughter, his new girlfriend, and her children to see Christmas lights in Dallas. That meant his daughter would be out later than the curfew set by the girl's mother and appellant. Nguyen asked if he could return her at a later time, but the child's mother would not agree to it without appellant's input. When the mother and appellant eventually decided to deny the request, Nguyen had already left on the outing. This resulted in his returning the girl home shortly before 10:00 p.m.

> Appellant awaited Nguyen's arrival, and when he appeared with the child, appellant insisted on discussing the matter. At that point, Nguyen leaned

---

[1] "SHR" refers to the state court record of petitioner's state habeas proceeding in WR-89,769-01.

against the back door of his car, crossed his arms, and began conversing with appellant. All the while, Nguyen's girlfriend and her children sat within that vehicle and witnessed the events about to unfold.

The discussion grew heated. Nguyen allegedly raised his voice and thrusted his finger at and slowly moved towards appellant. Yet, appellant did not fear for his life when that was occurring. Though he said he did not feel safe and feared that the circumstances "could lead to" serious bodily injury or death, he did not fear imminent bodily injury or death at the time. And, when asked by the prosecutor to disclose the "exact moment when you felt when you were in fear of imminent bodily injury or death," appellant answered as follows:

> The exact moment was when I asked, Do you want me to shoot you, and he screamed, Shoot me. And it was that scream mixed with him bringing his arms towards me that just—it wasn't like a conscious decision like that I had time to think about and pause and then shoot, it just happened in that very moment, that split second.

So, appellant drew the handgun and fired multiple times.

Appellant admitted that he saw no weapon on the decedent but, nonetheless, maintained that Nguyen was in a violent rage and was significantly bigger than him. So too did he acknowledge that he himself had been moving back slowly before threatening to shoot. And while it appeared that appellant could have walked away and ended the argument, he opted to remain and "avoid having that conversation over and over again, so I wanted to definitely talk about it with him and solve the problem then and there."

Nguyen never physically contacted appellant. And, despite the allegation that the decedent lunged in a violent manner with his arms open or forward, Nguyen's body was found by the police kneeling against the car, as if he slid down. The medical examiner also would later note the presence of evidence suggesting that Nguyen's arms were crossed when he was shot.

3

When it came time to charge the jury at the end of the guilt-innocence phase of the trial, the court agreed to instruct it on self-defense through use of deadly force. Yet, it denied appellant's request to tell the jury to deem reasonable his alleged belief about the need for deadly force. So too did the trial court refuse appellant's request founded upon § 9.31(b)(5) of the Texas Penal Code, which request would have interjected the topic of whether appellant was lawfully possessing the firearm used to kill Nguyen.

After deliberating, the jury rejected the claim of self-defense, [and] found appellant guilty of murder . . . .

(Mem. Op. 2-4, doc. 12-3 (footnote omitted).)

## II. ISSUES

In one ground for relief, petitioner claims that he received ineffective assistance of appellate counsel because counsel failed "to raise the prosecutor's improper closing argument." (Pet. 6, doc. 1.) He requests the Court issue a writ of habeas corpus unless the state grants him a new appeal. (Id. at 16.)

## III.  RULE 5 STATEMENT

Respondent believes that petitioner has exhausted his state court remedies with respect to the claim raised and does not allege that the petition is barred by limitations or subject to the successive-petition bar. (Resp't's Answer 6, doc. 11.) 28 U.S.C. §§ 2244(b), (d) & 2254(b)(1).

## IV. LEGAL STANDARD FOR GRANTING HABEAS CORPUS RELIEF

A § 2254 habeas petition is governed by the heightened standard of review provided for in the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the

4

Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as established by the United States Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. 28 U.S.C. § 2254(d)(1)-(2); *Harrington v. Richter,* 562 U.S. 86, 100 (2011). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Richter*, 562 U.S. at 102.

The statute also requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. It is the petitioner's burden to rebut this presumption by clear and convincing evidence. *Id.*

Further, when the most recent state court to consider a constitutional issue provides a "reasoned opinion," a federal habeas corpus court must "review[] the specific reasons given by the state court and defer[] to those reasons if they are reasonable." *Wilson v. Sellers,* — U.S. —, 138 S. Ct. 1188, 1191-92 (2018). If the opinion "does not come accompanied with those reasons," a federal court should "'look through' the unexplained decision to the last related state-court decision

5

providing" particular reasons, both legal and factual, "presume
that the unexplained decision adopted the same reasoning," and
give appropriate deference to that decision. *Id.*  When the Texas
Court of Criminal Appeals denies a federal claim in a state
habeas-corpus application without written opinion, a federal
court may presume "that the state court adjudicated the claim on
the merits in the absence of any indication or state law
procedural principles to the contrary" and applied the correct
"clearly established federal law" in making its decision. *Johnson
v Williams,* 568 U.S. 289, 298 (2013); *Richter,* 562 U.S. at 99;
*Schaetzle v. Cockrell,* 343 F.3d 440, 444 (5th Cir. 2004).

## V. DISCUSSION

A criminal defendant has a constitutional right to the
effective assistance of counsel at trial and on a first appeal as
of right. U.S. Const. amend. VI, XIV; *Evitts v. Lucey*, 469 U.S.
387, 393-95 (1985); *Strickland v. Washington*, 466 U.S. 668, 688
(1984); *Anders v. California*, 386 U.S. 738, 744 (1967). To
establish ineffective assistance of counsel, a petitioner must
show (1) that counsel's performance fell below an objective
standard of reasonableness, and (2) that but for counsel's
deficient performance the result of the proceeding would have
been different. *Strickland*, 466 U.S. at 688. The *Strickland*
standard applies to claims alleging ineffective assistance by
appellate counsel. *Blanton v. Quarterman,* 543 F.2d 230, 240 (5th

Cir. 2008). In this context, a petitioner must demonstrate that
(1) his appellate counsel's performance was objectively
unreasonable and (2) there is a reasonable probability that, but
for appellate counsel's objectively unreasonable conduct, the
petitioner would have prevailed on appeal. In applying this test,
a court must indulge a strong presumption that counsel's conduct
fell within the wide range of reasonable professional assistance.
*Id.* at 668, 688-89. The petitioner bears the burden of proof on
both components of the *Strickland* standard. *Id.* at 687. If the
petitioner makes an insufficient showing on either component, the
court need not address the other. *Id.* at 697.

Ineffective-assistance-of-counsel claims are considered
mixed questions of law and fact and, therefore, are analyzed
under the "unreasonable application" standard of § 2254(d)(1).
*See Gregory v. Thaler,* 601 F.3d 347, 351 (5th Cir. 2010). Where,
as here, the state courts have adjudicated the ineffective-
assistance claim(s) on the merits, this court must review a
petitioner's claims under the "doubly deferential" standards of
both *Strickland* and § 2254(d). *Cullen v. Pinholster,* 563 U.S.
170, 190 (2011). In such cases, the "pivotal question" for this
court is not "whether defense counsel's performance fell below
*Strickland*'s standard"; it is "whether the state court's
application of the *Strickland* standard was unreasonable."
*Richter,* 562 U.S. at 101. *See also id.* at 105 ("Establishing that

7

a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so. (internal quotation marks and citations omitted)).

Petitioner claims that the state courts unreasonably concluded contrary to Supreme Court precedent that appellate counsel rendered effective assistance in not raising an issue on appeal regarding the state's improper jury argument during the guilt/innocence phase of his trial. (Pet.  6, doc. 1.) Specifically, petitioner complains of the state's closing argument that—

> Even if [petitioner]'s trial testimony was credible, it did not provide a basis for [petitioner] to believe he was about to be killed, and thus to use deadly force. The State did not leave it at that, though, instead arguing in its guilt-phase closing that [petitioner] was lying, "the product of two and a half years of trial preparation" and an "education about what's required for you to kill somebody." The prosecutor urged that, in truth, the victim was "dead because [petitioner] felt disrespected." But [petitioner]'s appellate counsel did not complain of this argument.

(Id.) According to petitioner, the argument "struck over [his trial] attorneys' shoulders to paint [petitioner] not as a man who tragically overreacted and regrets it every day, but as a scheming, manipulative liar." (Pet'r's Br. 6, doc. 6.) Trial counsel objected to the argument, but the trial court overruled the objection.

8

Petitioner retained the law firm of Kearney | Winn to represent him at trial and on appeal. Petitioner raised two ineffective-assistance-of-counsel claims in his state habeas application, one of which was later withdrawn. The remaining claim corresponds with the claim presented in this federal petition. The state habeas judge, who also presided over the trial, referred the application to a magistrate judge for hearing, factual findings, and conclusions of law. (SHR, vol. 3, pt. 2, 1442, doc. 12-27.) Toward that end, the magistrate judge ordered affidavits from counsel to address petitioner's allegations. Wm. Reagan Wynn, who primarily handled the appeal, responded in his affidavit, in relevant part, as follows:

> On March 8, 2016, Mohammed Khaled Awde retained our firm to represent him on appeal from his conviction and sentence. I do all of the appellate work in our firm and, accordingly, I was primarily responsible for reviewing the appellate record, drafting the Brief, and presenting oral argument to the court of appeals. On November 3, 2016, I filed our Appellant's Opening Brief on Mr. Awde's behalf. A copy of that Brief is attached to this Affidavit . . . . On April 11, 2017, I presented oral argument to the court of appeals on Mr. Awde's behalf. On May 3, 2017, the court of appeals affirmed Mr. Awde's conviction. On July 5, 2017, I filed a Petition for Discretionary Review in the Court of Criminal Appeals seeking review of the court of appeals' decision. A copy of that Petition is attached to this Affidavit . . . . The Court of Criminal Appeals refused that Petition on September 13, 2017.

> I am providing this Affidavit in response to an Application for Writ of Habeas Corpus filed on Mr. Awde's behalf on October 12, 2018. From reviewing the Application for Writ of Habeas Corpus, it appears that Mr. Awde claims we rendered ineffective assistance of counsel in two ways. First, he alleges we failed to

adequately prepare him to testify during the punishment phase of trial and, accordingly, that he did not make fully informed decision not to testify at punishment. Second, Mr. Awde claims we rendered ineffective assistance of counsel on appeal by failing to raise appellate claims concerning improper jury arguments by the prosecutor.

In preparation for drafting this affidavit, I have reviewed my notes from our pretrial preparations, the appellate record, the Brief, my notes from oral argument, and the PDR.

.  .  .

With regard to the claim concerning our failure to include claims on appeal regarding the State's improper jury arguments, as stated above, I was primarily responsible for reviewing the appellate record and drafting the Brief. Having tried the case, I believed we had strong arguments concerning the trial court's refusal to give full and complete jury instructions concerning the self-defense laws even before I reviewed the appellate record. I fully reviewed the appellate record in Mr. Awde's case. I specifically recall reviewing the State's closing argument in question and my objections to it. I made the objections because I knew from prior research that arguments such as those the State made are improper.

However, I was also aware that any error from this kind of State's jury argument constitutes "other errors" reviewed for harm under TEX. R. APP. P. 44.2(b). In other words, to demonstrate reversible error from the State's jury argument, we would have had to show that the error affected Mr. Awde's substantial rights. I was also aware that the Court of Criminal Appeals had held that, applying this standard, improper State's jury argument were not reversible unless they are manifestly improper, violate a mandatory statute, or inject new, harmful facts into the case. In light of the evidence in the case and the totality of the State's jury argument, I did not believe we had a particularly strong harm argument with regard to the State's improper jury arguments. Importantly, I certainly believed the two jury charge arguments we advanced on appeal were significantly stronger than any improper State's jury argument issue we could raise.

In my appellate practice, I am very aware that I am not required to raise every potentially meritorious claim on appeal. As the United States Supreme Court has stated,

> Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues . . . . "Usually, . . . if you cannot win on a few major points, the others are not likely to help . . . ." This has assumed a greater importance in an era when oral argument is strictly limited in most courts-often to as little as 15 minutes-and when page limits on briefs are widely imposed . . . . For judges to second-guess reasonable professional judgments and impose on [appellate] counsel a duty to raise every "colorable" claim suggested by a client would disserve the very goal of vigorous and effective advocacy.

Simply put, I believed at the time I wrote the Brief, and continue to believe today, that the two jury charge issues we raised were meritorious and justified reversal. Obviously, the court of appeals disagreed with my position, but that does not change my opinion that the improper State's jury argument issue was significantly weaker than the jury charge arguments.

Moreover, as I was writing the Brief and discussing it with Jeff and Rhett, I specifically remember talking to them about the jury argument issue as wells [sic] as some potential evidentiary issues. I said then, and I believe now, that if Mr. Awde's conviction was not going to get reversed for the jury charge errors we raised, there was almost no chance it was going to get reversed on any other grounds, including the improper jury argument issue.

In sum, I was aware of the possible improper State's jury argument issue and made a conscious decision not to raise it in the Brief we filed because I believed it was tactically better to focus solely on the jury charge issues that I believed then, and continue to believe now, to be meritorious.

11

(SHR, vol. 3, pt. 2, 1459-69, doc. 12-27.)

Based on the record and counsel's affidavits, the magistrate judge entered the following factual findings, which were later adopted by both the state habeas court and the Texas Court of Criminal Appeals:

6.   Mr. W. Reagan Wynn represented Applicant during the appellate proceedings.

7.   Mr. Wynn has a reputation in Tarrant County for being a thorough and conscientious advocate for his appellate clients.

8.   Applicant testified at trial.

9.   On cross-examination, defense counsel asked Officer Driesenga whether he detailed in his report what he was now testifying Amanda Awde had told him.

10.  On cross-examination of Officer Driesenga, defense counsel implied that the officer's testimony was different than what he put in his offense report because "[the State] figure[d] out that apparent danger [was] an issue and talked to [him] [the prior] week."

11.  The defense's cross-examination implied that Officer Driesenga changed his testimony after talking to the State to comport with the elements of the offense.

12.  During closing arguments on guilt/innocence, defense counsel argued, in part, as follows:

     . . . Be careful with Amanda's statement. You know those statements that came up, this officer that after two years hadn't told anybody -- he says he told Pate. He didn't put it in his report. And you know what, Officer Pate's right there. He could have walked five feet to this gate and got up there and said, yeah, that officer told me about that that night. It's not in my report,

12

it's not in the officer's report. *And if that was true, they'd have brought Pate this five feet and put him up there. But you know, they didn't do that. All they had to do is say, Pate, were you told that? He said no.*

. . .

The judge told you to bring your common sense, I'm telling you that if you look at this with common sense, a man that had a brand new family, a brand new baby on the way, had no history whatsoever of any kind of aggressive behavior, and if he did, they had the ability, the power of the State could have –– if they could have found one human being that's ever seen him do anything violent, they would have brought him up here. But they didn't because it doesn't exist. That's not who he is. You heard who he is. . .

13.   The State made the following argument, in part, in response:

. . . And Mr. Kearney talked about that there's this huge wide range of what could be ordinary and what could be prudent. But we have to ask ourselves, is there ever a situation where we want to have a position in our community that you can gun somebody down in this situation? That's what tells us it's not ordinary. That's what tells us a prudent person would not feel this is justified.

But let's give the Defendant the benefit of the doubt. Even if you believed everything this Defendant told you, still not self defense. *Even if you bought this story, this story that is the product of two and a half years of trial preparation.*

. . .

Even understanding what the Defendant told you, even if you believed everything the Defendant told you, Kevin Nguyen posed no immediate deadly threat to this Defendant.

13

Period. There's no way to get around that
this justification of apparent danger,
because they have to concede there was no
danger of deadly force. There was no visibly
deadly force coming at the Defendant that
night. So they have to concede that. But
their whole case then is apparent danger.
*Based upon everything the Defendant knew, he
felt he was justified in murdering Kevin
Nguyen. Based upon the fact that family
members have been murdered? No, that had
nothing to do with Kevin -- or friends that
had been murdered, family members had been
robbed. That had nothing to do with Kevin. He
talked about how scared Kevin made him
because of what he knew about him. Because
somebody carries a pocket knife in their car,
that justifies you murdering somebody? No
evidence of anything in his hands. No
evidence of him threatening him. No evidence
of him raising his fists even until here in
the courtroom. But even if you buy this
lunging story, now that the Defendant has
gotten an education about what's required for
you to kill somebody –*

. . .

*Even if you don't consider conversations with
the Defense, I'm talking about his
conversation with Detective Pate. Because it
wasn't until Detective Pate told him you
can't kill somebody unless you're in fear of
being killed does he say that.*

. . .

And for all the talk about why Kevin's upset,
why Kevin could be ticked off, what about the
fact that Mohammed doesn't want his
stepdaughter to celebrate Christmas in the
way his biological father would like him to?
That could produce a lot of anger. This
Defendant forcing himself onto Kevin every
time Kevin was around, even though Kevin
tells him over and over, I do not want to
talk to you. He's the one that forces himself

14

upon him. He's the one that insists on
talking about Christmas. He's the one —
reasonable deduction from this evidence, he's
the one who does not want Emma out late to
watch Christmas lights and see Christmas
lights with the father, biological father she
never sees. That's him.

*So who's the problem here? After two and a
half years, all they can come up with is,
well, eight years before he was involved in a
burglary.* We don't know anything about that.
We don't even know how much real information
the Defendant had about that. All we know is
he knew that Kevin was involved in a
burglary. And he carried a knife and now he
lunged at me, if you believe everything the
Defendant told you.

*But why is it that we know we can't believe
the Defendant? The Defendant told you that he
never included his -- in his statement that
Kevin lunged at him because he wanted to
limit his answers.* Mr. Kearney talked about
common sense. But let me ask you about that.
*You're being interviewed by a homicide
detective about a shooting you just committed
and you want to limit your answers? And in
limiting your answers you're leaving out the
one thing that shows the victim was being
aggressive towards you? What does your common
sense tell you about that?*

He wants you to believe that he carries a gun
all the time and keeps a gun in the garage
because it's a bad neighborhood and because
all that's gone on in his life, and yet he
still insists on smoking outside with the
garage door open. Heck, he was, according to
him, about to walk down to a neighbor's house
down the street at 10 o'clock at night
leaving his garage door open at home. But
he's scared to death of a bad neighborhood
and because of that, Kevin's dead. Because
Kevin wanted to ask his daughter what she
wanted for Christmas, got upset and hung up
the phone, that makes the Defendant put a

15

shotgun by his bed. But all of this you heard
about a lifetime of family members being
victimized and friends being shot, that
didn't make him put a shotgun by your bed. As
Bill told y'all, this is not evidence of why
he shot Kevin Nguyen. This is not a
justification for why Mohammed Awde could
have legally shot Kevin. It's backdoor and
sympathy evidence and it has no bearing on
what we're here for.

The moment at which Mohammed Awde decided to
take Kevin away from his mother and father,
from all the friends here, that's what we're
here to talk about, that moment.

Defense counsel said in his opening statement
that you were going to hear evidence of an
escalation and that as things progressed the
victim got more and more upset. But all the
evidence you've heard, the real evidence,
credible evidence, is Kevin was upset from
the moment, according to them initially, he
was upset the moment Amanda started dating
the Defendant. He was the same throughout, I
don't want to talk to you. There's no
escalation here. It doesn't fit their
narrative, but it's not. There is no
escalation here. The escalation is coming
from this Defendant exercising more control
over Emma, exercising more control over
Amanda. And it's the disrespect he felt when
his wishes weren't honored that are the
reason Kevin Nguyen is not with us today.
It's not about self defense. It's about his
pride.

I find it interesting that they want you to
give the benefit of the CHL [concealed
handgun license] to the Defendant. They want
you to give the Defendant the benefit of
having the CHL as justification for why he's
allowed to have it up there. But they don't
want you to impart the knowledge of what the
law says when you can use deadly force. They
don't want you to think about that. They
don't want you to think about the fact that
if you're going to carry a handgun, you need

16

the extra responsibility of knowing when you can use it. And that's not right. He has an extra responsibility to use it responsibly and he didn't do that.

. . .

Let's talk about credibility, though. There were so many inconsistencies between the scene defendant and the courtroom defendant that I had to start writing them down. So I thought I'd show you the list. Courtroom defendant was obviously much more in fear of his life. He gives you things like the victim lunging at him, whereas at the scene in the one-hour conversation with Detective Pate, all the Defendant could say is, He put his finger in my face and I felt threatened. The fact that he comes and goes from the garage and smokes out there, it's not a huge deal. It doesn't really have a bearing on why Kevin is dead, but it goes to their credibility. Because when this Defendant was talking to Detective Pate, he told him over and over, I stayed out there in the garage because I didn't want to miss him. He goes to school in Maine, I never get to talk to him, I was out there because I did not want him to get away. Here in the courtroom now the Defendant and his whole family are just saying he's always out there, it wasn't about Kevin.

Well, which is it? *You can believe courtroom defendant or are you going to believe the Defendant there talking to the detective before two and a half years?*

At the time the Defendant said: I shot until he fell. But the Defendant here in the courtroom before you today said: I don't know how many times I fired, maybe three or four. I don't remember anything. I pulled the gun and fired. First one was an accident coming down to the ground. First time you've heard that. But don't hold him accountable for leaving stuff out before; just the State's witnesses.

17

Here in the courtroom he said he felt threatened. There at the scene -- or excuse me, in the interview with Detective Pate, Defendant says over and over, He never threatened me. He never threatened me. One of the things that the Defendant says in his recorded interview with Detective Pate -- and again, if you have doubts about this, like Bill said, ask to see the -- to hear the interview. But the Defendant says, I kept scooting back, I kept scooting back. But remember when he was on the stand and I asked him to stand up here, and I said, get as close to this rail as you were to Kevin. And the Defendant says like this (indicating). And I said so when you started scooting back, and he goes, I never scooted back. Maybe I leaned back, but I didn't scoot back. Maybe ultimately a foot. Whereas back in December of 2013 it was three to five feet. Which defendant are you going to believe?

Lastly, here in the courtroom you have heard the Defendant and all his family and friends say he always has a gun on him because of his tragic past. And I don't know what closing argument you were listening to, I didn't hear Mr. Vassar make fun of anything. I thought he was actually being very respectful. And I share condolences about the rough life this Defendant has had, and maybe that justifies him carrying a gun, and he's legally allowed to do so. But in testimony everybody said he's always had the gun. And that night when it finally came down to it and he was pinned down, he said, I had the gun in case things went bad. Which defendant are you going to believe?

Well, let's make it easy for you. Let's talk about the testimony of Natalie Flores. And according to the Defense, it's a travesty of justice that she testified to some things that weren't in her written statements. Forget about what the Defendant has come up with. It was impossible to write down everything she said. And for all the horrible feelings the Defendant was having and he was

18

in shock and he couldn't say things straight,
you heard how upset Natalie was that night.
You heard it in her voice right after it
happened. What did Natalie tell you? First
off she told you Defendant started this.
Defendant walked out to us. He walked out to
us angrily and he said, Why is Emma here
late? Yes, she tells you that the victim was
leaning against the car the whole time.
Could she have watched it? Could she have
seen that the whole time? Think about where
she was in the front passenger seat. She'd
have a clear view of it. And the daughter
that she was arguing with was in the
backseat, so she's going to be turning and
looking at that. So isn't it reasonable,
doesn't it just make sense that she would
have noticed absolutely had Kevin ever gotten
into some sort of physical action against
this Defendant? Absolutely.

But beyond that, what does the physical
evidence tell us? As difficult as it is to
think about, in light of the injuries that
Kevin suffered, one of those bullet wounds,
the one that went through his chest, would
have made him paralyzed from the waist down.
One of those bullet wounds, the one that went
through the right side of his face through
his cervical spine would have made him
absolutely powerless to stand or lift his
arms. And where did he fall? Straight down
against the car. The kind of position, the
kind of fall that could only happen if he was
leaning back. Because if he was rushing
forward, he would have fallen forward.

.  .  .

*Two and a half years of trial preparation
can't argue away the physical evidence.* And
lastly, one foot away from the Defendant.
Victim and Defendant one foot apart. And this
new evidence, this new threat, the lunge,
Defendant told you he's standing this close
to the victim and the victim yells, Shoot me,
and lunges at him. And somehow this Defendant
manages to get a bulky full size .9

millimeter pistol out of a jacket pocket, he's able to whip that out, point it and shoot at the victim before the victim covers one foot of distance. One foot. Didn't happen. And we know it didn't happen because if they were this close to each other holding the gun out like this, the foot goes away, right? Contact wound. And there was no GSR [gunshot residue] on that injury to the face. The gun muzzle had to have been at least two feet away from the victim when he was shot. It didn't happen. Courtroom defendant's lying. And Kevin Nguyen is dead because that man felt disrespected. Because he didn't get his way and because he couldn't exercise control over Kevin the way he wanted to. This is not self defense. There is no reasonably prudent person who could think that Kevin Nguyen is dead for any reason other than that man's pride.

As Bill said, he and I are waiting for your verdict as well as Kevin's family. The only right verdict in this case is that Kevin was murdered. Thank you.

14. The State argued that Applicant's testimony was the "product" of trial preparation was in response to defense counsel's argument that Officer Driesenga's testimony was the product of the State's trial preparation.

15. The State's argument that Applicant changed his story over the last two years could have reasonably been considered a summation of the evidence.

16. The State's argument that Applicant changed his story after talking to Officer Pate could have reasonably been considered a summation of the evidence.

17. Mr. Wynn reviewed the appellate record and drafted the Applicant's brief.

18. After reviewing the record, Mr. Wynn concluded Applicant had strong arguments concerning the trial court's refusal to give full and complete

20

jury instructions concerning self-defense.

19.   Mr. Wynn was aware of the possible claim that the
      State's comments regarding trial preparation and
      education were improper.

20.   Mr. Wynn considered the fact that the improper
      comment argument was considered an "other error"
      and would be reviewed as "nonconstitutional."

21.   Mr. Wynn concluded, "[i]n light of the evidence in
      the case and the totality of the State's jury
      argument," that Applicant did not have a
      particularly strong harm argument with regard to
      the State's argument.

22.   Mr. Wynn's conclusion that the appellate court may
      find the improper jury argument issue harmless was
      reasonable.

23.   Mr. Wynn concluded that the two jury charge
      arguments he advanced on appeal were
      "significantly stronger" than any improper
      argument issue they could raise.

24.   Mr. Wynn concluded that, if Applicant's conviction
      was not going to be reversed based on the issues
      raised on appeal, it was not going to be reversed
      based on the improper jury issue.

25.   Mr. Wynn's decision to not raise the improper jury
      argument on direct appeal was the result of
      reasonable appellate strategy.

26.   There is no evidence that a reasonable likelihood
      exists that the outcome of the appellate procedure
      would have been different but for counsel not
      raising the improper jury issue on direct appeal.

(SHR, vol. 4, 1586-97, doc. 12-28 (emphasis in the original)
(citations omitted).)

Based on its findings, and applying the *Strickland* standard

and relevant state law, the state habeas court entered the

following legal conclusions:

21

4.  "To show that appellate counsel was
    constitutionally ineffective for failing to assert
    a particular point of error on appeal, an
    applicant must prove that (1) 'counsel's decision
    not to raise a particular point of error was
    objectively unreasonable,' and (2) there is a
    reasonable probability that, but for counsel's
    failure to raise that particular issue, he would
    have prevailed on appeal. An attorney 'need not
    advance every argument, regardless of merit, urged
    by the appellant.' However, if appellate counsel
    fails to raise a claim that has indisputable merit
    under well-settled law and would necessarily
    result in reversible error, appellate counsel is
    ineffective for failing to raise it."

5.  The Court of Criminal Appeals will presume that
    counsel made all significant decisions in the
    exercise of reasonable professional judgment.

6.  The totality of counsel's representation is viewed
    in determining whether counsel was ineffective.

7.  Support for Applicant's claim of ineffective
    assistance of counsel must be firmly grounded in
    the record.

8.  An attorney is under an ethical obligation not to
    raise frivolous issues on appeal.

9.  An attorney is prohibited from raising claims on
    appeal that are not founded in the record.

10. Counsel is not required to advance every argument;
    however, if he "fails to raise a claim that has
    indisputable merit under well-settled law," and
    the issue would have affected the outcome of the
    proceeding, counsel is ineffective for failing to
    raise it.

11. To be proper, jury argument must fall under one of
    the following areas (1) summation of the evidence,
    (2) reasonable deduction from the evidence, (3)
    answer to argument of opposing counsel, or (4)
    plea for law enforcement.

12. Applicant has failed to prove that his improper
    jury argument claim had "indisputable merit under

22

well-settled law."

13. Applicant has failed to prove that his improper
jury argument claim would have affected the
outcome of the appellate proceeding.

14. Applicant has failed to prove that counsel's
decision to not attack the State's closing
argument on direct appeal was not the result of
reasonable appellate strategy.

15. Applicant has failed to prove that appellate
counsel's representation fell below an objective
standard of reasonableness because he chose not to
raise on direct appeal that the State's jury
argument was improper.

16. Applicant has failed to prove that his appellate
attorney's representation fell below an objective
standard of reasonableness.

17. A party fails to carry his burden to prove
ineffective assistance of counsel where the
probability of a different result absent the
alleged deficient conduct "sufficient to undermine
confidence in the outcome" is not established.

18. "[A] court need not determine whether counsel's
performance was deficient before examining the
prejudice suffered by the defendant as a result of
the alleged deficiencies. The object of an
ineffectiveness claim is not to grade counsel's
performance. If it is easier to dispose of an
ineffectiveness claim on the ground of lack of
sufficient prejudice, which we expect will often
be so, that course should be followed."

19. Applicant has failed to show that there is a
reasonable likelihood that the outcome of the
appellate proceeding would have been different had
appellate counsel raised on direct appeal that the
State's closing argument was improper.

20. Applicant has failed to show that there is a
reasonable likelihood that, but for the alleged
acts of misconduct, the result of the appellate
proceeding would have been different.

21. Applicant has failed to prove that he received

23

ineffective assistance of appellate counsel.
(Id. at 1597-1600.)

The state habeas judge adopted the actions of the magistrate judge and, in turn, the Texas Court of Criminal Appeals denied habeas relief on the trial court's findings. (SHR, 1st Supp. R., 7, doc. 12-23.)

Petitioner has not presented clear and convincing evidence to rebut the state courts' factual findings. Thus, this court must defer to those findings. Having done so, and contrary to petitioner's assertion, the state courts' application of *Strickland* was not objectively unreasonable. Petitioner asserts that, in deciding that there was not a particularly strong harm argument, counsel failed to consider how the improper argument could affect—and did affect—petitioner's punishment. (Pet'r's Corrected Br. 12, 17, doc. 6.) Therefore, counsel's decision based on an "incomplete analysis as to the multiple ways in which the improper argument may have been harmful" and "born from inattention, oversight, or neglect is not a reasonable strategic decision." (Id. at 20.)

In reviewing claims of ineffective assistance of appellate counsel, the Supreme Court has expressly observed that appellate counsel "need not advance every argument, regardless of merit, urged by the [] defendant." *Evitts v. Lucey*, 469 U.S. 387, 394 (1985). When alleging ineffective assistance of appellate

counsel, the defendant "must show that the neglected claim would have had a reasonable probability of success on appeal." *Duhmelel v. Collins,* 955 F.2d 962, 967 (5th Cir. 1992). However, failing to raise every meritorious claim on appeal does not make counsel deficient. *Green v. Johnson,* 116 F.3d 1115, 1125-26 (5th Cir. 1997). Courts give great deference to professional appellate strategy and applaud counsel for "winnowing out weaker arguments on appeal and focusing on one central issue if possible, and at most a few key issues. . . ." *Jones v. Barnes,* 463 U.S. 745 (1983). This is true even where the weaker arguments have merit. *Id.* at 751-2. The applicable test is whether the omitted issue(s) was "clearly stronger" than the issue[s] actually presented on appeal. *Smith v. Robbins,* 528 U.S. 259, 288 (2000). Petitioner

Petitioner makes no convincing showing that had the improper-jury-argument issue been raised on appeal, he would have prevailed or that the claim was clearly stronger than the ones actually raised on appeal. Counsel identified and raised the issues he believed, in the exercise of professional judgment, had the best chance of success on appeal of his conviction <u>and</u> sentence. Having reviewed the closing arguments and the evidence, in toto, this court cannot conclude that counsel's analysis was clearly faulty. The complained-of remarks do not appear to be a direct attack on defense counsel or an attack on petitioner "over the shoulder" of defense counsel. Nor do the remarks appear so

flagrant or inflammatory such that it would invoke emotions within the jurors that could cloud the proper determination of petitioner's sentence.

For the reasons discussed,

The court ORDERS the petition of petitioner for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be, and is hereby, denied. The court further ORDERS that a certificate of appealability be, and is hereby, denied, as petitioner has not made a substantial showing of the denial of a constitutional right.

SIGNED July ___10___, 2020.


JOHN MCBRYDE
UNITED STATES DISTRICT JUDGE